1

2

3

4

5

6

7

8          UNITED STATES  DISTRICT COURT

9            Northern District of California

10            San Francisco Division

11   MASAIL E. ELIZALDE,                    No. C 14-0992 LB

12                     Plaintiff,           **ORDER GRANTING PART**
                                            **PLAINTIFF'S MOTION FOR**
         v.                                 **SUMMARY JUDGMENT AND**
13                                          **DENYING DEFENDANT'S CROSS-**
     CAROLYN W. COLVIN,                     **MOTION FOR SUMMARY**
14   Commissioner of Social Security,       **JUDGMENT**

15                     Defendant.
     _____        [Re ECF Nos. 16, 18]
16

17                       **INTRODUCTION**

18        In this action, Plaintiff Masail Elizalde seeks judicial review of a final decision by Defendant

19   Carolyn Colvin, the Commissioner of the Social Security Administration.  (Complaint, ECF No. 1.[1])

20   He asks the court to grant summary judgment in his favor, arguing that the Administrative Law

21   Judge ("ALJ") did not properly consider the evidence before her, erred in finding that Mr. Elizalde

22   could work in jobs that exist in significant numbers in the national economy and thus in denying his

23   claim for disability insurance benefits under Title II of the Social Security Act.  (Motion for

24   Summary Judgment ("MSJ"), ECF No. 16.)  The Commissioner opposes Mr. Elizalde's motion for

25   summary judgment and cross-moves for summary judgment.  (Cross-Motion, ECF No. 18.)  All

26

27   _____

28        [1] Citations to the Administrative Record ("AR") are to the page numbers at the bottom of the
     pages.  Citations to other documents in the record are to the Electronic Case File ("ECF"), with
     pinpoint citations are to the ECF-generated page numbers at the top of the pages.

1  parties have consented to this court's jurisdiction.  (Consent Forms, ECF Nos. 29, 30.)  Pursuant to

2  Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral

3  argument.  Upon consideration of the administrative record, the parties' briefs, and the applicable

4  legal authority, the court grants in part Mr. Elizalde's motion for summary judgment, denies the

5  Commissioner's cross-motion for summary judgment, and remands the action for further

6  proceedings.

7                                    **STATEMENT**

8  **I. PROCEDURAL HISTORY**

9       In February 2007, Mr. Elizalde applied for both disability insurance benefits under Title II and

10  supplemental security income under Title XVI of the Social Security Act.  (AR 84.)  In May of that

11  year, the Commissioner denied his application for Title II disability insurance benefits because of

12  insufficient evidence, but granted his application for Title XVI supplemental security income.  (AR

13  84.)  Mr. Elizalde thus has received Supplemental Security income since February 2007.  (AR 80-

14  82.)

15      On February 4, 2011, Mr. Elizalde once again applied for Title II disability insurance benefits.

16  (AR 165-173.)  On April 7, 2011, the Commissioner denied his application because "[t]he medical

17  evidence in file is insufficient to establish how [his] condition affected [his] ability to perform work

18  activities as of" December 31, 2004, "the date [he] last met the earnings requirements for disability

19  benefits."  (AR 94.)  In Social Security Administrative parlance, this is known as the "date last

20  insured."  (*See* AR 31.)  Thus, the Commissioner found Mr. Elizalde "not to have been under a

21  disability as of" December 31, 2004.  (AR 94.)

22      On May 10, 2011, Mr. Elizalde requested reconsideration of the Commissioner's decision.  (AR

23  100.)  On August 10, 2011, the Commissioner affirmed her decision.  (AR 101-05.)  She reiterated

24  that "the medical evidence in file is insufficient to establish how [his] condition affected [his] ability

25  to perform work activities from the date [he] stopped working [(April 1, 2002)], until the date last

26  insured [(December 31, 2004)]."  (AR 102.)

27      On September 9, 2011, Mr. Elizalde requested a hearing before an ALJ.  (AR 107.)  ALJ Maxine

28  Benmour conducted a hearing on August 15, 2012.  (AR 31, 53-75)  At the hearing, non-attorney

1   Heather Myler represented Mr. Elizalde.  (AR 31.)  Mr. Elizalde and vocational expert ("VE")

2   Jeffrey Malmuth testified.  (AR 31.)  On September 14, 2012, the ALJ issued her decision that Mr.

3   Elizalde was not disabled from April 1, 2002 through the date last insured, December 31, 2004.  (AR

4   28-39.)

5       On November 19, 2012, Mr. Elizalde filed an application for review with the Appeals Council

6   requesting the reversal of the ALJ's decision and an award of benefits.  (AR 15-17.)   On January 23,

7   2014, the Appeals Council affirmed ALJ Benmour's decision denying benefits.  (AR 1-6.)

8       Mr. Elizalde filed the complaint in this action on March 4, 2014.  (Complaint, ECF No. 1.)  On

9   June 9, 2014, the Commissioner answered the complaint and lodged a copy of the Administrative

10  Record with the court.  (Answer ECF No. 14; Administrative Record, ECF No. 15.)  On July 11,

11  2014, Mr. Elizalde filed his motion for summary judgment.  (MSJ, ECF No. 16.)  The Commissioner

12  filed her opposition and cross-motion for summary judgment on August 8, 2014.  (Cross-Motion,

13  ECF No. 18.)  On August 23, 2014, Mr. Elizalde filed his response.  (Response, ECF No. 19.)

14  **II.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS**

15      **A.  Evidence of Carjacking**

16      Mr. Elizalde submitted a police report and other documents related to a carjacking that took

17  place on March 2, 2002.  (AR 150-64.)  According to the police report, Mr. Elizalde was driving

18  down Harold Way near Bronson Avenue in Los Angeles, California when a vehicle cut him off and

19  came to a stop in front of him.  (AR 152.)  One of the two suspects exited the vehicle with a shotgun

20  and ordered Mr. Elizalde out of the car.  (AR 152.)  In fear for his life, Mr. Elizalde got out of the

21  car.  (AR 152.)  The suspect then ordered him to lay on the ground.  (AR 152.)  Both suspects then

22  departed; one drove their car and the other drove Mr. Elizalde's car.  (AR 152.)  Mr. Elizalde

23  subsequently received phone calls from one of the suspects, who told Mr. Elizalde where he could

24  retrieve his car, that things were missing from it, and to "be cool about it."  (AR 153.)  The police

25  later identified Marlon Chacon and Alfred Gochez as the perpetrators, and Alfred Gochez was

26  charged with carjacking.  (AR -151-56.)

27      On June 11, 2002, with the help of a victim assistance representative, Mr. Elizalde applied for

28  crime victim compensation.  (AR 158-59.)  The application form indicates that Mr. Elizalde was

UNITED STATES DISTRICT COURT
For the Northern District of California

unemployed.  (AR 158.)  Although Mr. Elizalde made no markings on the part of the form where

victims may mark the types of expenses and losses for which they seek compensation, California's

Victim Compensation and Government Claims Board approved his claim, set a mental health

coverage cap of $10,000, and paid $950.00 of his medical expenses.  (AR 163-64.)

**B.  Medical Evidence**

### *1.  Los Angeles County & University of Southern California Med. Ctr. (June 10, 2003)*

At 8:30 p.m. on June 10, 2003, the Los Angeles Police Department brought Mr. Elizalde to Los

Angeles County & University of Southern California Medical Center.  (AR 342-44.)  The hospital

admitted Mr. Elizalde for an involuntary psychiatric hold under California Welfare and Institutions

Code 5150 ("5150 hold").  (AR 342-44.)  The LAPD brought Mr. Elizalde in because they received

a call from a friend of Mr. Elizalde reporting that he had expressed wanting to kill himself and had

attempted suicide by walking into traffic, which resulted in a traffic accident, but minimal harm to

Mr. Elizalde.  (AR 342-44.)

The records are difficult to read, but it appears that Mr. Elizalde was at risk of suicide and

elopement, and had a confused thought process and flat affect.  (AR 334, 343, 346, 348.)  The

treating physicians listed diagnostic impressions of depression, adjustment disorder, and a third

disorder.  (AR 348-50.)

The next day, the hospital discharged Mr. Elizalde.  (AR 344.)  The hospital referred him to the

Los Angeles County Department of Mental Health's Hollywood Mental Health Center for outpatient

follow-up.  (AR 234-35, 333.)

### *2.  University of California San Diego, Alan Mayfield, M.D. (May 9, 2007)*

Nearly four years later, on May 9, 2007, Dr. Alan Mayfield, a psychiatrist at the University of

California San Diego, wrote to the Commissioner on behalf of Mr. Elizalde.  (AR 237-239.)  His

letter does not indicate whether he personally treated Mr. Elizalde, nor does it indicate the source of

his findings.  (AR 237-239.)

Dr. Mayfield wrote that Mr. Elizalde's mood fluctuated between depressed and anxious, that he

had poor insight and judgment, and that he had a flat affect.  (AR 237.)  Dr. Mayfield reported that

Mr. Elizalde complained of anxiety, panic attacks that felt like heart attacks, depression, low energy,

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

feelings of hopelessness and worthlessness, as well as difficulty sleeping due to nightmares.  (AR 237.)  Dr. Mayfield also reported Mr. Elizalde complained of living in constant fear that he would be harmed again.  (AR 237.)

Dr. Mayfield indicated that Mr. Elizalde was diagnosed with HIV and neurosyphillis in December 2006.  (AR 237.)  He also indicated that Mr. Elizalde's health problems caused him to stay in the hospital for more than two weeks, although it is unclear when this occurred.  (AR 237.)  Dr. Mayfield reported Mr. Elizalde was hospitalized and received electro-shock therapy at the age of 16.  (AR 238.)  Dr. Mayfield wrote Mr. Elizalde had not worked since 2004.  (AR 238.)  The letter stated Mr. Elizalde's diagnoses as:

Axis I:  major depressive disorder, PTSD [post-traumatic stress disorder], and amphetamine dependence in remission;

Axis II:  HIV;

Axis IV:  legal problems, economic problems, and housing problems.

(AR 239.)

Finally, Dr. Mayfield wrote that Mr. Elizalde's prognosis was unclear because his treatment began only four months prior, placing the start of treatment in approximately January 2007.  (AR 239.)  Again, it is unclear whether this treatment was performed by Dr. Mayfield or was received elsewhere and simply reported to Dr. Mayfield by Mr. Elizalde.

### 3.  University of California San Diego Medical Records (March 26, 2008-August 18, 2009)

#### (a)  Robert Kiernan (March 26, 2008-July 22, 2008)

On June 10, 2008, Mr. Elizalde visited someone named Robert Kiernan.  (AR 260-261.)  The notes do not indicate whether or not Mr. Kiernan was a doctor, nurse practitioner, or some other medical professional or specialist.  Mr. Kiernan reports that Mr. Elizalde presents "somewhat vague, non-progressive, non-traumatic" left breast tenderness for two months.  (AR 260.)  Mr. Kiernan opined Mr. Elizalde's patient medical history was positive for anxiety, but that his anxiety was stable at the time of the visit because of his prescriptions.  (AR 260.)  Mr. Elizalde complained to Mr. Kiernan that he thought his right mastectomy was botched, but that he settled a lawsuit on that matter for $11,000.  (AR 260.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On June 24, 2008, Mr. Elizalde visited Mr. Kiernan to follow up on his mastitis.  (AR 259-60.)

2    He complained of enlargement and tenderness of his left breast for at least two months.  (AR 259.)

3    Mr. Kiernan indicated that Mr. Elizalde's condition had not changed after 10 days of Septra, an

4    antibiotic, and "w/m/c's."  (AR 259.)  Mr. Kiernan indicated that Mr. Elizalde's physical medical

5    history was positive for a left benign mass after "botched surg distantly," but that his physical

6    medical history was negative for "hypogonad."  (AR 259.)  Mr. Kiernan wrote that Mr. Elizalde's

7    antiretroviral medications, including Atripla, were "frs-sparing."  (AR 259.)  Mr. Kiernan opined

8    that Mr. Elizalde's HIV was stable, and that he should follow up in three months.  Additionally, Mr.

9    Kiernan indicated that Mr. Elizalde was "otw anxious" and preferred to continue with work-up

10   including testing of testosterone levels, mammography, and "u/s."  (AR 259.)

11       On July 22, 2008, Mr. Elizalde visited Mr. Kiernan for a routine follow-up.  (AR 255-56.)  Mr.

12   Kiernan again noted that Mr. Elizalde's HIV was stable.  (AR 255-56.)  Mr. Kiernan also noted a

13   mammogram confirmed gynecomastia, and that Mr. Elizalde should "rtc prn," or return to the clinic

14   as needed.  (AR 255-56.)  Mr. Kiernan listed Mr. Elizalde's medications as:  Atripla, Cymbalta,

15   Geodon, Inderal, and Wellbutrin.  (AR 255-56.)

16                    *(b)  Barbara Smith (April 28, 2008-July 3, 2008)*

17       On April 28, 2008, Mr. Elizalde visited Barbara Smith.  (AR 265-66.)  As with Mr. Kiernan, Ms.

18   Smith's professional status is unclear.  Under subjective findings, Ms. Smith reported Mr. Elizalde

19   had a long psychiatric history and took Ritalin in high school.  (AR 265.)  Ms. Smith wrote Mr.

20   Elizalde was prescribed Adderal XR by a psychiatrist at the Gifford Clinic, followed by Cymbalta

21   and Wellbutrin, but that the combination of medicine made him more anxious and lightheaded.  (AR

22   265.)  He and a psychiatrist at the Gifford Clinic planned to reinitiate Adderal, but did not end up

23   following that course of treatment.  (AR 265.)  Thereafter Mr. Elizalde stopped seeing the Gifford

24   Clinic psychiatrist for personal reasons.  (AR 265.)  Mr. Elizalde, however, had used what remained

25   of his old prescription to reinitiate Adderal on his own several weeks prior to visiting Ms. Smith.

26   (AR 265.)  Ms. Smith also reported, in her subjective findings, that Mr. Elizalde had "PTSD from

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

car jacking 4 years ago." (AR 265.)[2]  Additionally, the subjective findings indicate Mr. Elizalde reported having nightmares and panic attacks where he hyperventilates, especially when driving at night. (AR 265.)  Mr. Elizalde further complained of tunnel vision, shortness of breach, and profuse sweating, described by Ms. Smith as "diaphoresis chronically." (AR 265.)  Mr. Elizalde also reported having nightmares, not sleeping long, and being better able to sleep, but groggy, when he took Benadryl. (AR 265.)  Ms. Smith wrote his energy fluctuated between extreme highs and lows, and that he ate once a day, but experienced no weight change. (AR 265.)  His concentration and motivation fluctuate. (AR 265.)  Mr. Elizalde did not express suicidal or homicidal ideation and had no auditory visual hallucinations. (AR 265.)  Under past psychiatric history, Ms. Smith reported that Mr. Elizalde tried Celexa, Cymbalta, Neurontin, Adderal, Dexedrine, Prozac, Zoloft, and Wellbutrin. (AR 265.)  Prozac made him nauseous, Zoloft made him sleep all day, and Wellbutrin increased his anxiety. (AR 265.)  Cymbalta gave him no side effects except sleepiness.  Under habits, Ms. Smith indicated "no alcohol since 2000; no meth x 2 years at parties; no marijuana since HS. no tobacco." (AR 266.)

Ms. Smith's objective findings state that Mr. Elizalde was very anxious, rocking in his chair, speaking hesitantly, and in an anxious mood. (AR 266.)  She further indicated he had a flat affect, logical thought process, and thought content without suicidal ideation, homicidal ideation, or auditory visual hallucinations. (AR 266.)  Ms. Smith's final objective assessment lists PTSD and panic disorder. (AR 266.)  Her recommended treatment plan was to have Mr. Elizalde continue Cymbalta, begin Buspar, and follow-up in two weeks. (AR 266.)  Mr. Elizalde's medications at the time included Atripla and Cymbalta. (AR 266.)

On May 1, 2008, Ms. Smith entered notes into Mr. Elizalde's chart. (AR 264-65.)  It does not appear that Mr. Elizalde actually visited Ms. Smith on May 1. (AR 264-65.)  Under subjective findings, Ms. Smith states the pharmacy informed her that Mr. Elizalde asked the pharmacy for Wellbutrin XL 300 mg. (AR 264.)  A Dr. Charles Ashcroft originally issued the prescription in August 2007, but Mr. Elizalde did not fill it.  AR 264.)  Ms. Smith instructed the pharmacy that she

---

[2] This statement erroneously places the carjacking in 2004, not 2002.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  did not prescribe Wellbutrin, and that Mr. Elizalde was to discuss it with her first.  (AR 264.)

2      On May 12, 2008, Mr. Elizalde followed up with Ms. Smith.  (AR 262-64.)  Her subjective

3  findings included that Mr. Elizalde's anxiety was intermittent and that he had side effects from

4  Buspar.  (AR 262.)  Buspar gave him nausea, foggy and dry eyes, and made "him feel like not

5  getting up."  (AR 262.)  Two days before the visit, Mr. Elizalde stayed in bed for two days.  (AR

6  262.)  Ms. Smith also reported that Mr. Elizalde was still depressed, and that he "feels that

7  everything is awful and not going to get better.  Feels that life is over.  Feels like he died when he

8  was shot in the car jacking 4 yearrs ago."  (AR 262.)  The date of this visit was the first time Mr.

9  Elizalde had left his house in two weeks.  (AR 262-63.)  Mr. Elizalde said that Adderal "gets him

10  out of the house," but also said that it increased his anxiety, although he suggested that his anxiety

11  could be treated by Inderal.  (AR 263.)  Ms. Smith discussed therapy with Mr. Elizalde, but he

12  reported that weekly sessions made his depression worse and caused him to cry afterwards.  (AR

13  263.)

14      Ms. Smith's objective findings found Mr. Elizalde was calmer, cooperative, and speaking

15  "WNL."  (AR 263.)  He had a depressed mood, flat affect, logical thought process, intact insight,

16  judgment, and impulse control, and expressed no suicidal or homicidal ideation.  (AR 263.)  Ms.

17  Smith assessed Mr. Elizalde as having anxiety disorder, depressive disorder, and significant and

18  unresolved side effects from Buspar.  (AR 263.)  Ms. Smith indicated Mr. Elizalde preferred

19  Adderal and agreed to Wellbutrin.  (AR 263.)  Accordingly, she recommended continuing Cymbalta,

20  discontinuing Buspar, starting Wellbutrin, and therapy.  (AR 263.)  Mr. Elizalde's medications at the

21  time of this visit included Atripla, Buspar, Cymbalta, and Inderal.  (AR 263-64.)

22      On June 4, 2008, Mr. Elizalde visited Ms. Smith again.  (AR 261-62.)  Under subjective findings

23  she indicated Mr. Elizalde was doing better and had more energy, but still had carjacking nightmares

24  twice a week.  (AR 261.)  Mr. Elizalde stated that he had recently had a panic attack while driving

25  that caused him to pull over and get out of the car.  (AR 261.)  Ms. Smith spoke to Mr. Elizalde

26  about deep breathing and explained that Inderal takes time to work.  (AR 261.)

27      Objectively, Ms. Smith found Mr. Elizalde was alert, oriented, casually groomed with good

28  hygiene, cooperative with good eye contact, and  speaking with normal rate, tone, and articulation.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   (AR 261.)  She further found Mr. Elizalde had a frustrated mood, wide ranging affect, logical and

2   linear thought process, intact insight, judgment, and impulse control, and that he expressed no

3   suicidal or homicidal ideation.  (AR 261.)  Ms. Smith assessed that Mr. Elizalde had anxiety

4   disorder with panic attacks and "PTSD like nightmares" as well as depressive disorder that

5   improved with Wellbutrin.  (AR 261.)  Ms. Smith recommended that Mr. Elizalde increase

6   Wellbutrin, continue Inderal, and follow up in two to three weeks.  (AR 262.)  She also noted Mr.

7   Elizalde declined therapy referrals.  (AR 262.)  At the time of the visit, Mr. Elizalde's listed

8   medications included Atripla, Cymbalta, Inderal, and Wellbutrin.  (AR 262.)

9        On July 3, 2008, Mr. Elizalde again visited Ms. Smith.  (AR 257.)  Ms. Smith reported that Mr.

10   Elizalde recently went to the Vista Balboa Crisis Center because of stress, and that he was worried

11   about having breast cancer due to his family history.  (AR 257.)  Ms. Smith further reported that Mr.

12   Elizalde slept a couple hours at night and a couple hours during the day and that his energy was low.

13   (AR 257.)  Mr. Elizalde told her he got cranky and irritable at times.  (AR 257.)  She opined that Mr.

14   Elizalde still suffered from PTSD, anxiety, and depression, and that he reported being too nervous or

15   "freaked out" to leave the house.  (AR 257.)  Ms. Smith further indicated Mr. Elizalde had gotten a

16   cat, which helped him takes his mind off of his conditions.  (AR 257.)  Mr. Elizalde reported being

17   easily distracted from tasks and not accomplishing anything.  (AR 257.)  Ms. Smith listed his

18   medications as Cymbalta and Wellbutrin, and that he reported feeling like a zombie when he took

19   Seroquel.  (AR 257.)  Ms. Smith indicated Mr. Elizalde found a therapist who would see him free of

20   charge, but that he had not found a therapist that would accept MediCal.  (AR 257.)  Ms. Smith's

21   objective findings state that Mr. Elizalde was well groomed, not moving abnormally, cooperative

22   with good eye contact, speaking at a somewhat rapid but interruptible pace.  (AR 257.)  These

23   objective findings also describe Mr. Elizalde as depressed, anxious, and wide ranging in affect but

24   primarily dysphoric.  (AR 257.)  Ms. Smith also noted that Mr. Elizalde was logical and linear in his

25   thought process, not expressing suicidal or homicidal ideation, and in possession of intact insight,

26   judgment, and impulse control.  (AR 257.)  Ms. Smith recorded a final assessment of PTSD, anxiety

27   disorder, and depressive disorder.  (AR 258.)  Ms. Smith recommended an "antipsychotic for

28   antidepressant augmentation," and that Mr. Elizalde try Geodon in addition to continuing to take

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Cymbalta and Wellbutrin.  (AR 258.)

2       *(c)  Mathias Kill, M.D., Vishal Bansal, M.D. (September 22-23, 2008)*

3   Mr. Elizalde had a left mastectomy on September 22, 2008.  (AR 254.)  The operation was for

4  gynecomastia.  (AR 254.)  Notes from the attending surgeon, Dr. Vishal Bansal detailed the surgical

5  procedure and indicated Mr. Elizalde had a right mastectomy in the past and was taking Wellbutrin,

6  which may also have impacted his gynecomastia.  (AR 254.)  On September 23, 2008, Dr. Mathias

7  Kill noted that Mr. Elizalde was hemodynamically stable and had good pain control.  (AR 254-55.)

8  Dr. Kill further indicated a plan to continue pain control, advance Mr. Elizalde's diet, and discharge

9  him.  (AR 254.)

10      *(d)  Emergency Rm., Jim Dunford, M.D., Michael Wilson, M.D. (August 18, 2009)*

11   On August 18, 2009, Mr. Elizalde admitted himself to the emergency room at UC San Diego

12  Medical Center.  (AR 244.)  Attending physician Dr. Jim Dunford and medical resident Dr. Michael

13  Wilson treated Mr. Elizalde for a rash on his lower extremities.  (AR 244-53.)  Dr. Dunford's

14  treatment notes indicate Mr. Elizalde had a painful and itchy rash on his lower extremities, pain in

15  his ankle that prevented him from doing weight bearing activities, and some feverishness.  (AR 244.)

16  Dr. Dunford assessed that Mr. Elizalde probably had herpes simplex virus.  (AR 244.)  Dr. Dunford

17  indicated he could not rule out other vasculitis, but that he doubted Mr. Elizalde had gonococcus or

18  "other sepsis states."  (AR 244.)  Dr. Wilson diagnosed Mr. Elizalde with Henoch Schonlein

19  purpura. (AR 246-49.)  Dr. Dunford prescribed prednisone for Mr. Elizalde's ankle as well as Atarax

20  and Percoset for itching.  (AR 247.) The hospital discharged Mr. Elizalde later that day with

21  instructions to follow-up with a primary care physician in 2-3 days.  (AR 247.)

22      **4.  West County Health Centers (December 9, 2010-Present)**

23      *(a)  Michelle Davey, D.O., Primary Care (December 9, 2010-Present)*

24   On December 9, 2010 Mr. Elizalde had an initial appointment to establish care with an

25  osteopath, Dr. Michelle Davey.  (AR 319.)  Mr. Elizalde met with Victoria MacDonald, and was to

26  meet with Marti Briscoe at some point after this appointment with Dr. Davey.  (AR 319.)  Mr.

27  Elizalde wanted to know the results of his blood tests, and was not on any antiretroviral medications

28  at the time of his appointment.  (AR 319.)  Mr. Elizalde complained of pain in his left breast, a

1   complication from previous surgeries on both his right and left breasts for painful cysts.  (AR 319.)

2   Mr. Elizalde reported initially taking Wellbutrin for depression, but later being prescribed Cymbalta.

3   (AR 319; *see also* AR 261-66.)  Mr. Elizalde explained that "[h]is feelings of depression stem from

4   being diagnosed with HIV."  (AR 319.)  Mr. Elizalde said that he had not been taking his medication

5   for several months, but that he felt better without it.  (AR 319.)  Dr. Davey added that Mr. Elizalde

6   had not received ADD or ADHD diagnoses, but had difficulty concentrating, completing tasks, and

7   avoiding distractions.  (AR 319.)  She also wrote that his difficulty concentrating negatively

8   impacted his online classes.  (AR 319.)  Dr. Davey reported Mr. Elizalde "strongly desires

9   medication to help him with this problem."  (AR 319.)  Mr. Elizalde indicated he was once

10  prescribed Dexedrine, and that the Dexedrine helped with his difficulty concentrating.  (AR 319.)

11      Mr. Elizalde opined that he had skin grafts on his chest and neck as a child due to burns.  (AR

12  319.)  Mr. Elizalde also reported problems with swelling in his joints, including his left ankle.  (AR

13  319.)  Previously, another practitioner aspirated his ankle, gave him medicine which eliminated the

14  swelling, and told him he had rheumatoid arthritis.  (AR 319.)  Mr. Elizalde listed his current

15  medications as Wellbutrin, Cymbalta, Dexedrine Spansule, propranolol, hydroxyzine hydrochloride,

16  and Roxicet.  (AR 319.)  He provided a past medical history including HIV, diagnosed 3/1/2006,

17  PTSD, ADHD, and "2002 was shot in carjacking incident where gunshot grazed forehead."  (AR

18  319.)

19      Dr. Davey described Mr. Elizalde as well developed, well nourished, alert, and oriented.

20  (AR 320.)  She indicated Mr. Elizalde bit his fingernails, jiggled his leg, and rocked through the

21  entire visit.  (AR 320.)  Dr. Davey noted that he had a regular heart rate/rhythm and good eye

22  contact but that he had some difficulties concentrating and seemed anxious.  (AR 320.)  Dr. Davey

23  assessed Mr. Elizalde as having HIV, joint disease, attention deficit disorder, and pruritic conditions.

24  (AR 320.)  Dr. Davey recommended that Mr. Elizalde start taking Atripla and Bactrim, and that he

25  continue taking Wellbutrin, Cymbalta, and hydroxyzine.  (AR 320.)  She also prescribed Ritalin.

26  (AR 320.)  Mr. Elizalde's T cell count was low, and Dr. Davey indicated this changed his diagnosis

27  from HIV to AIDS.  (AR 320.)  She ordered additional labs, and wrote that Mr. Elizalde agreed to

28  take his mental health medications again, but that he would probably need to see Dr. Zeff for a

UNITED STATES DISTRICT COURT
For the Northern District of California

1    diagnosis first.  (AR 320.)

2        On January 14, 2011, Mr. Elizalde followed up with Dr. Davey.  (AR 315-16.)  There were no

3    changes to his medications.  (AR 315.)  Mr. Elizalde initially reported feeling fine, but admitted to

4    feeling depressed after further questioning.  (AR 315.)  He expressed concern that Wellbutrin

5    worked better than generic bupropion, but his insurance does not cover brand name Wellbutrin.  (AR

6    315.)  Dr. Davey reports that "Ritalin was approved," and a prescription for it would be filled by the

7    pharmacy.  (AR 315.)  Mr. Elizalde stated the Ritalin made him feel different, but was not more

8    specific.  (AR 315.)  He continued to take Atripla, but wanted to stop taking Bactrim.  (AR 315.)

9    Dr. Davey assessed Mr. Elizalde as having AIDS and "major depression, single episode."  (AR 315.)

10   She reported Mr. Elizalde was "NAD," alert, oriented, well nourished, and hydrated.  (AR 315.)  She

11   reported he had a flat affect, a small smile at one point, and difficulty accessing his feelings.  (AR

12   315.)  Dr. Davey recommended continuing all medications as is, with the addition of Effexor.  (AR

13   316.)  Dr. Davey discussed potential side effects of Effexor with Mr. Elizalde, and noted he had

14   "responded poorly to nearly all of the SSRI meds" he had tried in the past.  (AR 316.)  She further

15   recommended weekly follow up visits with Dr. Briscoe, and a follow up with her in two weeks.

16   (AR 316.)

17       On January 20, 2011, Dr. Davey issued a letter indicating an HIV diagnosis date of March 1,

18   2006, an AIDS diagnosis date of December 1, 2010, a CD4 value of 86, and a VL value of 31300.

19   (AR 285.)

20       On January 28, 2011, Mr. Elizalde saw Dr. Davey for a check-up.  (AR 310-12.)  He reported

21   that the combination of Ritalin and bupropion made him feel different than he remembered feeling

22   when he took psychiatric medications previously.  (AR 310.)  Mr. Elizalde also expressed concerns

23   about his rash, previously diagnosed by Dr. DeEtte DeVille as secondary syphilis.  (AR 310.)  Dr.

24   Davey found Mr. Elizalde was well groomed, well dressed, initially anxious and jumpy, but

25   subsequently relaxed.  (AR 311.)  Dr. Davey assessed that Mr. Elizalde had epididymitis, AIDS, and

26   tinea pedis.  (AR 311.)  She ordered additional labs, prescribed ketoconazole, and remarked that Mr.

27   Elizalde planned to start taking the Effexor she had previously prescribed.  (AR 311.)

28       On February 11, 2011, Mr. Elizalde visited Dr. Davey to discuss his lab results, check his T cell

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  count, and seek further treatment for his rash.  (AR 308-09.)  Mr. Elizalde reported that he started

2  taking Effexor but still felt depressed or "kind of blah."  (AR 308.)  He reported feeling tired, having

3  low energy, feeling emotionally numb, and a lack of interest in everyday activities, described by Dr.

4  Davey as anhedonia.  (AR 308.)  Dr. Davey found Mr. Elizalde was well nourished, hydrated, and

5  "NAD."  (AR 308.)  She also found his rash looked no worse.  (AR 308.)  Dr. Davey assessed that

6  Mr. Elizalde had AIDS, overactive bladder, depression, and a rash.  (AR 309.)

7       On March 10, 2011, Mr. Elizalde saw Dr. Davey again.  (AR 306-07.)  Mr. Elizalde complained

8  of tender lumps on his back, and continued rash symptoms.  (AR 306.)  He reported that he felt

9  better on Adderall than he had on Ritalin.  (AR 306.)  He stopped taking Effexor and started taking

10  Seroquel and said that he had not had any problems with depression since this medication change.

11  (AR 306.)  Dr. Davey assessed that Mr. Elizalde had overactive bladder, AIDS, attention deficit

12  disorder without mention of hyperactivity, rash, and lipoma. (AR 307.)  Dr. Davey suspected anxiety

13  contributed to Mr. Elizalde's urinary frequency, but referred him to urology.  (AR 307.)

14       On April 1, 2011, Mr. Elizalde saw Dr. Davey for back pain and vocal difficulties.  (AR 302-03.)

15  As a professionally trained singer, Mr. Elizalde was concerned about his throat because he was

16  unable to sing in different registers or transition between vocal registers smoothly.  (AR 301.)  His

17  dermatologist prescribed Lamisil for the persistent rash on his foot, but Mr. Elizalde wanted to

18  verify there would be no interactions with his antiretroviral medications.  (AR 301.)  Mr. Elizalde

19  also reported feeling a sudden pain in his back that turned into sharp and persistent lower back pain

20  and impacted his ability to walk.  (AR 301.)  Dr. Davey found Mr. Elizalde was well nourished and

21  hydrated, and that he seemed uncomfortable, standing initially, but was able to sit down part way

22  through the exam.  (AR 301.)  Dr. Davey assessed that Mr. Elizalde had sacroiliitis, vocal cord or

23  larynx polyps, attention deficit disorder without mention of hyperactivity, and tinea pedis.  (AR

24  301.)  Dr. Davey prescribed Flexeril for back pain, and referred Mr. Elizalde to an ear, nose, and

25  throat specialist for his vocal difficulties.  (AR 302-03.)  She recommended that Mr. Elizalde

26  continue to take Adderall, and verified that the Lamisil would not interact with his antiretroviral

27  medication in a harmful manner.  (AR 303.)

28       On April 15, 2011, Mr. Elizalde visited Dr. Davey.  (AR 300-01.)  He reported concerns about

the discoloration of his feet while taking Lamisil.  (AR 300.)  He opined that they began to look purple on his fourth day of treatment.  (AR 300.)  He reported that upon stopping the Lamisil, his feet returned to their normal color.  (AR 300.)  Dr. Davey recommended trying a different anti-fungal medication in two or three weeks to maintain the pulse therapy plan.  (AR 300.)

On May 20, 2011, Mr. Elizalde followed up with Dr. Davey, reporting chest pain.  (AR 298-99.) Mr. Elizalde explained that an old friend had visited him, and that upon a firm hug he felt a sharp stabbing pain in the right side of his chest.  (AR 298-99.)  He reported difficulty breathing and sharp stabbing pain.  (AR 298-99.)  Dr. Davey found Mr. Elizalde was in moderate distress.  (AR 298-99.) She had to discontinue palpation because it was too painful of Mr. Elizalde.  (AR 298-99.)  Dr. Davey order a chest x-ray to check for a rib fracture, and prescribed Vicodin for pain management. (AR 298-99.)  The x-rays showed normal heart size, normal pulmonary vascularity, clear lungs, and unremarkable cariomediastinum.  (AR 322.)  The x-rays showed no pleural effusion was present, and that the hilar contours and lung volumes were normal.  (AR 322.)

### (b) Nina Redman, R.D. (January 13, 2011)

On January 13, 2011, Mr. Elizalde visited registered dietitian Nina Redman for a nutrition consultation.  (AR 317-18.)  Ms. Redman advised Mr. Elizalde that he needed to increase his fiber intake, and that he could do so through increased consumption of fruit and of different whole grain breads.  (AR 317.)  She further advised Mr. Elizalde about preventing lipodystrophy, which he could accomplish by reducing his saturated fat intake and increasing his fiber intake.  (AR 317.)  Finally, she recommended counseling for body image issues and food stamps to increase his food choices. (AR 317.)

### (c) DeEtte Deville, M.D. (January 22, 2011)

On January 22, 2011, Mr. Elizalde visited DeEtte Deville, M.D.  (AR 313-14.)  He complained of a rash on his forehead that persisted for four days and blisters on his feet.  (AR 313.)  He informed Dr. Deville that he did not think his Ritalin was working.  Dr. Deville wrote "[u]rinary frequency Q 10 min No dyswria.  No penile dk."  (AR 313.)  Mr. Elizalde also had headaches and woke up because of nasal congestion.  (AR 313.)  Mr. Elizalde once again complained that he felt stressed and did not think the bupropion worked, and that it may have been impacting his urination.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  (AR 313.)

2                  *(d)  Marti Briscoe, Psy.D (February 8, 2011)*

3      On February 8, 2011, Dr. Marti Briscoe issued a letter to a generic recipient.  (AR 287)  The

4  letter stated that:

5        Mr. Masail Elizalde is currently in psychotherapy and also being treated by our physician for

6  depression and Post Traumatic Stress Disorder which followed a car jacking on April 1, 2002.  He continues to experience extensive stress, anxiety and agoraphobia.  He is in a constant state of fear that he may be hurt or killed.  Due to the nature of his Post Traumatic

7  Stress Disorder he is unable to currently work.

8  (AR 287.)

9            *(e)  Deborah Warren, F.N.P. (April 11, 2011)*

10      On April 11, 2011, Deborah Warren, a family nurse practitioner, treated Mr. Elizalde.  (AR 304-

11  05.  Mr. Elizalde went in for treatment because his foot rash continued to cause him discomfort.

12  (AR 304.)  His dermatologist had prescribed Lamisil, but Nurse Warren recommended discontinuing

13  that course of treatment as it appeared to exacerbate his symptoms.  (AR 304.)

14           *(f)  David Gorchoff, M.D. (May 23, 2011)*

15      On May 23, 2011, Dr. David Gorchoff treated Mr. Elizalde.  (AR 296-97.)  Mr. Elizalde had

16  recently visited the emergency room at Palm Drive Hospital for chest pain and a potential rib

17  fracture.  (AR 296.)  Mr. Elizalde reported continued chest pain and expressed concern because the

18  emergency room doctor stated his x-rays showed an enlarged liver.  (AR 296.)  Dr. Gorchoff

19  assessed that Mr. Elizalde had rib pain due to a possible contusion or fracture. (AR 296.)  He

20  prescribed Toradol, and told Mr. Elizalde that the final interpretation of the chest x-ray did not

21  suggest hepatomegaly.  (AR 296.)  He further explained to Mr. Elizalde that sometimes rib fractures

22  do not show up on x-rays, but that they heal on their own over six to eight weeks.  (AR 296.)

23          *(g)  Arnold Zeff, M.D. (December 28, 2011)*

24      On December 28, 2011, Dr. Arnold Zeff wrote a letter to an unspecified recipient.  (AR 331.)

25  The letter stated:

26        Mr. Elizalde is under my psychiatric care.  His psychiatric disorders are completely disabling

27  him.  He suffers from Post Traumatic Stress Disorder and Agoraphobia.

28

(AR 331.)

**5. *Social Security Administration, D. Pong, M.D. (April 5, 2011)***

Dr. D. Pong, a Social Security Administration evaluating physician, completed a case analysis on April 5, 2011. (AR 288-89.) Dr. Pong stated that there were no inconsistencies between reports and allegations. (AR 288-89.) Under credibility, Dr. Pong made a finding of non-credibility because there were no records to substantiate Mr. Elizalde's allegations. (AR 288-89.) Dr. Pong further reported that there were no records submitted for review, and accordingly, that Dr. Pong recommended ineligibility for the Title II claim with a date last insured of 12/31/2004. (AR 288-89.) Dr. Pong wrote "Agree w/ IE" on April 5, 2011. (AR 289. On 4/6/11, upon "TM Review" a D. Fawkes wrote "OK for IE." (AR 288-89.)

**6. *Social Security Administration, L. Gottschalk, M.D. (July 13, 2011)***

Dr. L. Gottschalk, a Social Security Administration evaluating physician, completed a case analysis reconsidering Mr. Elizalde's claim on July 13, 2011. (AR 83-90.) The case analysis indicates the Commissioner requested records from Stepping Stone, a rehabilitation facility, UC San Diego medical center, and victims' witness assistance. (AR 87.) Dr. Gottschalk reviewed the letters from Dr. Briscoe and Dr. Mayfield as well as Mr. Elizalde's other reported symptoms. (AR 87.) An entry in the case file from July 7, 2011 recommends affirming the Commissioner's April 5, 2011 decision of ineligibility for Disability Insurance Benefits. (AR 88.) Another entry on July 7, 2011 recommends ineligibility and states that "Y MD" did not conduct a review at the initial assessment, but there are "Y" records in the file such that Mr. Elizalde was still ineligible upon reconsideration. *Id.* On July 13, 2011, Dr. Gottschalk wrote "Y MC," and found Mr. Elizalde to still be ineligible. (AR 88.) On July 14, 2011, Dr. G.B. Williams wrote "I wonder if anyone told thie [*sic*] clmnt that he was ineligible for befifits [*sic*] because this is a T2 only claim, and the DLI was 12/31/04? Still [ineligible]." (AR 88.)

**C. Administrative Hearing**

**1. *Mr. Elizalde***

Mr. Elizalde testified before the ALJ on August 15, 2012. (AR 53, 59.) Mr. Elizalde said that he had graduated from high school and completed one year of college and that his last job, which

UNITED STATES DISTRICT COURT
For the Northern District of California

1    ended in 2002, was as an entertainer.  (AR 59.)  He had Supplemental Security Income benefits, but

2    wanted to get Social Security Disability Benefits, necessitating proof that his disability began before

3    December 2004.  (AR 60.)  Mr. Elizalde said that, while his depression set in almost immediately

4    after the carjacking in March 2002, he did not receive any treatment for it until after the 5150 hold in

5    June 2003.  (AR 60.)

6         When asked about his move out of Los Angeles and whether he was still in the vicinity, Mr.

7    Elizalde testified that he was relocated to San Diego by victim's witness protection.  (AR 60.)  He

8    experienced symptoms of depression and PTSD while in San Diego, but claimed he did not seek out

9    treatment because he did not know how.  (AR 60-61.)  Witness protection told him he could get

10   mental health treatment, but he did not know who to contact.  (AR 61.)  He stayed in San Diego for

11   approximately six months before trying to move back to Los Angeles to work on a cruise ship.  (AR

12   61.)  During rehearsal for the cruise ship performances, Mr. Elizalde had difficulty concentrating

13   and staying focused.  (AR 61.)

14        Sometime thereafter, while staying with a friend in Hollywood, Mr. Elizalde had a lot of

15   emotional problems, ultimately leading to the 5150 hold.  (AR 62.)  He confirmed that prior to the

16   hold he had told someone he wanted to kill himself.  (AR 64.)  Upon further questioning by the ALJ,

17   Mr. Elizalde explained that he walked into traffic because his car had been booted.  (AR 64.)  At the

18   time it was booted, he had just finished repairing damage to his car from the carjacking.  (AR 64.)

19   During the 5150 hold, Mr. Elizalde spoke with a psychologist who told him he had adjustment

20   disorder.  (AR 65.)  They did not medicate him during the hold, and simply discharged him the next

21   day.  (AR 65.)  Mr. Elizalde testified that after being held overnight, he went back to San Diego

22   where he stayed until 2008 or 2009 because he was afraid of going back to Los Angeles.  (AR 62.)

23   Mr. Elizalde testified that no one told him about mental health services before or after the 5150 hold,

24   but that he did go to one appointment after the 5150 hold.  (AR 62.)  Later in the hearing he reported

25   receiving no mental health treatment until 2006, when he entered a rehabilitation program.  (AR 65.)

26        Mr. Elizalde testified that he began self-medicating with crystal meth the night of the carjacking.

27   (AR 65-66.)  According to Mr. Elizalde, he was upset and was not hospitalized after the carjacking

28   so his friends gave him crystal meth to calm down.  (AR 66.)  He used crystal meth until going to

UNITED STATES DISTRICT COURT
For the Northern District of California

1  rehab in 2006.  (AR 66.)

2      When asked about his depression from 2002-2004, Mr. Elizalde testified that it was major, and

3  that he could not concentrate.  (AR 66.)  He felt he lost his livelihood as an entertainer and he felt

4  worthless.  (AR 66.)  When asked about his PTSD he testified to having constant nightmares.  (AR

5  67.)

6          ***2. Vocational Expert***

7      Jeffrey Malmuth, a vocational expert, also testified before the ALJ at the hearing.  (AR 71-74.)

8  Mr. Malmuth knew Mr. Elizalde worked as an entertainer from 1989-2002, but asked for additional

9  information about Mr. Elizalde.  (AR 72.)  Mr. Elizalde elaborated that he performed musical theater

10  in Las Vegas, Reno, Tahoe, and on cruise ships.  (AR 72.)  He also stated he worked at amusement

11  parks, and worked for Disney in Japan for three years.  (AR 72.)

12      Based on Mr. Elizalde's additional proffer, Mr. Malmuth testified that Mr. Elizalde's past jobs

13  could be categorize as amusement park entertainer, Dictionary of Occupational Titles ("DOT") code

14  159.647-010, and actor, DOT code 150.047-010.  (AR 73.)  Mr. Malmuth testified that an individual

15  with the claimant's age, education, work background, no exertional limitations, but who was limited

16  to simple, repetitive tasks with occasional contact with the public could not return to the claimant's

17  past work.  (AR 73.)

18      Next, Mr. Malmuth testified that such a person could work as a kitchen helper, DOT code

19  318.687-010 or as a hand packager, DOT code 920.587-018.  (AR 73.)  He stated that there were

20  approximately 190,000 kitchen helper jobs nationally, 25,000 in California, and 800 locally.  (AR

21  73.)  He stated that there were approximately 57,000 hand packager jobs nationally, 8,000 in

22  California, and 100 locally.  (AR 73-74.)

23      Finally, the ALJ posed a hypothetical asking whether a person missing work three times a week

24  would be able to do any jobs.  (AR 74.)  Mr. Malmuth testified that he did not believe an individual

25  missing work three times a week would be employable in regular work or that such a rate of

26  absenteeism would be tolerated by any employer regardless of exertional strength.  (AR 74.)  Mr.

27  Elizalde's representative, Ms. Myler, declined to ask Mr. Malmuth any questions.  (AR 74.)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D. ALJ's Findings**

ALJ Benmour issued a decision on September 14, 2012.  (AR 28.)  The ALJ found Mr. Elizalde was last insured on December 31, 2004.  (AR 33.)

At Step One, the ALJ found that Mr. Elizalde did not engage in substantial gainful activity from his alleged onset date of April 1, 2002 through his date last insured, December 31, 2004.  (AR 33.)

At Step Two, the ALJ found that, through the date last insured, Mr. Elizalde had the severe impairments of PTSD and depressive disorder.  (AR 33.)

At Step Three, the ALJ found that Mr. Elizalde did not have an impairment or combination of impairments that met or medically equaled the listings 12.04 and 12.06.  (AR 34.)  The ALJ found Mr. Elizalde did not meet the Paragraph B criteria, requiring at least two marked restrictions on activities of daily living or repeated episodes of decompensation, defined as three episodes within one year each lasting for at least two weeks.  (AR 34.)

In making this determination, the ALJ considered a number of factors.  First, the ALJ found Mr. Elizalde had only mild restrictions on activities of daily living.  (AR 34.)  Citing Dr. Mayfield's letter, the ALJ concluded that Mr. Elizalde could accomplish many daily living tasks, and that evidence of this, as well as the lack of evidence of his limitations prior to the date last insured, rendered his limitations no more than mild.  (AR 34.)  Second, the ALJ found Mr. Elizalde had only moderate difficulties in social functioning.  (AR 34.)  Again relying on Dr. Mayfield's letter, the ALJ noted that Mr. Elizalde went to group therapy, had a sponsor for smart recovery, but felt uncomfortable living outside of a sober living house.  (AR 34.)  Based on these findings, and due to a lack of evidence of Mr. Elizalde's limitations prior to the date last insured, the ALJ found Mr. Elizalde's social functioning limitations to be more than mild but less than marked.  (AR 34.)  Third, based on Dr. Mayfield's letter and a lack of evidence of Mr. Elizalde's limitations prior to his date last insured, the ALJ found Mr. Elizalde had only more than mild but less than marked limitations of concentration, persistence, or pace.  (AR 34.)  Lastly, the ALJ found that Mr. Elizalde experienced only one to two episodes of decompensation each of extended duration based on his admission to USC Medical center for a 5150 hold in June 2003.  (AR 34.)  Based on these four findings, the ALJ concluded that Mr. Elizalde did not have at least two marked limitations or one marked limitation

UNITED STATES DISTRICT COURT
For the Northern District of California

1   and repeated episodes of decompensation sufficient to satisfy the paragraph B criteria.  (AR 34.)

2        The ALJ also found that Mr. Elizalde did not meet the paragraph C criteria of listing 12.04 or

3   12.06.  (AR 35.)  Mr. Elizalde did not meet the criteria for 12.04, which requires a medically

4   documented history of a chronic affective disorder that has endured for at least two years and causes

5   more than a minimal limitation on the ability to do basic work activities as well as either repeated

6   episode of decompensation, residual disease process that would impact whether environmental

7   changes would cause decompensation, or current history of the inability to function outside of a

8   highly supportive living arrangement and indication of a continued need for such an arrangement.

9   (AR 35.)  Mr. Elizalde did not meet the criteria for 12.06, which requires that the anxiety-related

10   disorder cause a complete inability to function independently outside of one's home.  (AR 35.)

11        At Step Four, the ALJ found Mr. Elizalde had the residual functional capacity to perform a full

12   range of work at all exertional levels but with nonexertional limitations such that Mr. Elizalde was

13   limited to performing simple repetitive tasks with only occasional contact with the public.  (AR 35.)

14   Based on this RFC, the ALJ concluded that Mr. Elizalde could not have performed any past relevant

15   work as an amusement park entertainer or actor.  (AR 35.)

16        The ALJ found Mr. Elizalde's medically determinable impairments could reasonably be

17   expected to cause the symptoms he alleged, but that his statements about those symptoms were not

18   credible.  (AR 36.)  The ALJ noted inconsistencies between Mr. Elizalde's June 10, 2003 Global

19   Assessment Functioning Score of 30, and the physicians' description of Mr. Elizalde as calm,

20   cooperative, not in need of medication, and that he did not express suicidal or homicidal ideation

21   and adamantly denied auditory or visual hallucinations.  (AR 36.)

22        The ALJ gave little weight to the opinions of Dr. Mayfield, Dr. Briscoe, and Dr. Zeff because

23   they did not address Mr. Elizalde's ability to work prior to December 31, 2004; they addressed his

24   ability to work years after, and as such, were irrelevant to the decision on Mr. Elizalde's Disability

25   Insurance Benefits claim.  (AR 37.)  The ALJ also noted that the medical record as a whole also

26   failed to substantiate Mr. Elizalde's claims about his inability to work prior to December 31, 2004.

27   (AR 37.)  The ALJ also gave reduced weight to consulting physician L. Gottschalk's opinion

28   because the medical evidence did not establish the presence of severe mental impairments prior to

December 31, 2004. (AR 37.) The ALJ concluded that there was not enough evidence to establish Mr. Elizalde's inability to work because the only evidence was of a single [June 2003] hospitalization that produced conflicting evaluations of Mr. Elizalde. (AR 37.)

At Step Five, the ALJ found that Mr. Elizalde could have worked as a kitchen helper or hand packager, jobs he could perform with the ALJ's specified nonexertional limitation, and that existed in significant numbers in then national economy. (AR 37.) The ALJ found the vocational expert's testimony was consistent with information in the Dictionary of Occupational Titles. (AR 37.)

The ALJ concluded that Mr. Elizalde was not disabled between April 1, 2002 and his date last insured, December 31, 2004. (AR 37.)

# ANALYSIS

## I. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within sixty days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

## II. APPLICABLE LAW

### A. Five Steps to Determine Disability

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful

1   work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

2       There is a five-step analysis for determining whether a claimant is disabled within the meaning

3   of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

4       **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the
        claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a
5       substantially gainful activity, then the claimant's case cannot be resolved at step one, and the
        evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

6
        **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the
7       claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R.
        § 404.1520(a)(4)(ii).
8
        **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments
9       described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the
        claimant's impairment does not meet or equal one of the impairments listed in the regulations,
10      then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20
        C.F.R. § 404.1520(a)(4)(iii).
11
        **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she
12      has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the
        claimant cannot do any work he or she did in the past, then the case cannot be resolved at step
13      four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

14      **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the
        claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and
15      entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work,
        the Commissioner must establish that there are a significant number of jobs in the national
16      economy that the claimant can do. There are two ways for the Commissioner to show other jobs
        in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2)
17      by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. If
        the Commissioner meets this burden, the claimant is not disabled.
18
19      For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts

20      When determining whether a claimant is disabled, the ALJ must consider each medical opinion in

21      the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*,

22      No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). As a rule, the Social

23      Security Administration favors opinions of treating physicians over non-treating physicians. *See*

24      *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). The Social Security

25      Administration defers to treating physicians because they are employed to cure and have a greater

26      opportunity to know and observe their patients. *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600

27      (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). The conclusions of

28      the treating physician are not necessarily conclusive, however. *Id.* (citing *Magallanes v. Bowen*, 881

1    F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).

2    **III.  APPLICATION**

3        Mr. Elizalde assigns a number of errors to the ALJ's opinion.  Mr. Elizalde asserts that the ALJ

4    erred by: (a) inappropriately discounting the opinions of his treating physicians; (b) failing to clarify

5    a letter from Dr. Briscoe and failing to incorporate its contents into his RFC; (c) failing to consider

6    an evaluation done by Social Security Consulting physician Dr. Amado; (d) finding that his impairs

7    did not meet or equal a listing; (e) failing to ask the VE if his testimony conflicted with the

8    Dictionary of Occupational Titles; and (f) failing to provide clear and convincing reasons for

9    rejecting his subjective testimony.  *(See* MSJ, ECF No. 16.)  The court addresses each argument in

10   turn.

11       **A.  The ALJ Did Not Err by Discounting the Opinions' of Mr. Elizalde's Treating**

12           **Physicians**

13       Mr. Elizalde asserts that the ALJ erred by improperly rejecting the uncontradicted opinions of

14   his treating physicians.  (MSJ, ECF No. 16 at 10.)  When determining whether a claimant is

15   disabled, the ALJ must consider each medical opinion in the record together with the rest of the

16   relevant evidence.  20 C.F.R. § 416.927(b); *Zamora*, No. C 09-3273 JF, 2010 WL 3814179, at *3.

17   As a rule, the Social Security Administration favors opinions of treating/examining physicians over

18   nonexamining physicians. *See* 20 C.F.R. § 404.1527; *see also Penny v. Sullivan*, 2 F.3d 953, 957

19   (9th Cir. 1993) (finding a medical opinion "to be of very limited value" because the doctor had

20   "never personally examined" the claimant).  When an examining physician's opinion is

21   uncontradicted, "the Commissioner must provide "clear and convincing" reasons for rejecting" it.

22   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996).

23       Here, Dr. Mayfield stated that Mr. Elizalde appeared "unable to tolerate stresses common to the

24   work environment."  (AR 238.)  Dr. Briscoe opined that he was "unable to currently work."  (AR

25   357.)  Dr. Zeff described his disorders as "completely disabling."  (AR 331.)  Mr. Elizalde alleges

26   that the ALJ "failed to provide clear and convincing reasons why [these] uncontradicted treating

27   physicians . . . opinions were rejected."  (MSJ, ECF No. 16 at 10.)

28       The ALJ did not err here because she did not reject the opinions of these physicians. Instead, she

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

simply found them "essentially irrelevant" because "they do not opine that he was unable to work

prior to . . . the date last insured."  (AR 37.)  The ALJ implicitly accepted these opinions and took

them as true, but discounted their relevance for their inability to determine the question at issue.

Because the ALJ did not reject the content of these opinions, she was not required to provide clear

and convincing reasons for doing so.  Alternatively, if considering these opinions irrelevant to the

disability determination were to constitute a rejection, their failure to address the relevant time frame

would constitute a clear and convincing reason for that rejection.  Viewed either way, no error

occurred.

**B. The ALJ Did Not Err by Failing to Clarify Dr. Briscoe's Letter Nor by Failing to**

**Incorporate it Into Mr. Elizalde's RFC**

Mr. Elizalde argues that the ALJ erred by failing to clarify Dr. Briscoe's February 8, 2011 letter.

(MSJ, ECF No. 16 at 22 (citing 20 C.F.R. § 404.1512(e) (2009).)  "The Commissioner is required to

develop the claimant's complete medical record for at least the 12 months preceding the month in

which the claimant filed their disability application unless there is reason to believe the development

of an earlier period is necessary to determine the claimant's disability status."  *Avidano v. Astrue*,

No. C-09-3274 RMW, 2012 WL 1110019, at *4 (N.D. Cal. Mar. 31, 2012) (citing 20 C.F.R. §

416.912(d)).  "In evaluating whether the ALJ fulfilled his duty to develop the record, the Ninth

Circuit has held that an ALJ 'has a special duty to fully and fairly develop the record and to assure

that the claimant's interests are considered.'"  *Id.* (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th

Cir. 1983)).  "But, the ALJ is only required to develop the record further when there is ambiguous

evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Id.*

(citing *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)); *see also Tonapetyan v. Halter*,

242 F.3d 1144, 1150 (9th Cir. 2001) (same).

Mr. Elizalde asserts that Dr. Briscoe's February 8, 2011 letter was "retrospective or at least had

retrospective implication," and that any alternate reading of it stemmed from an ambiguity which

required the ALJ to further develop the record.  (MSJ, ECF No. 16 at 21-22.)  The letter, however,

cannot reasonably be construed as retrospective.  It states that Mr. Elizalde "is currently in

psychotherapy" (present tense), is "also being treated" (present progressive tense), "continues to

UNITED STATES DISTRICT COURT
For the Northern District of California

experience" (present tense), "is in a constant state of fear" (present tense), "is unable to currently
work" (present tense).  (AR 287.)  The letter does not discuss, either directly or by implication, his
mental impairments prior to the date of the letter, February 8, 2011.  While the letter does state that
Mr. Elizalde's mental impairments "followed a car jacking on April 1, 2002," all the word
"followed" indicates is that Mr. Elizalde's symptoms and impairments expressed themselves at some
point in time after April 1, 2002.  (AR 287.)  It does not mean that his symptoms arose on April 2,
2002 nor any time before December 31, 2004.  Similarly, the letter states that "[h]e continues to
experience extensive stress, anxiety and agoraphobia," but does not reference the date from which
he continued to experience these impairments.  (AR 287.)  There is thus no ambiguous language
which the ALJ was required to investigate further; the letter simply does not say what Mr. Elizalde
would like it to mean.  Accordingly, the ALJ did not err by failing to clarify Dr. Briscoe's letter.  *See
Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (an "ALJ's duty to develop the record
further is triggered only when there is ambiguous evidence.")

Mr. Elizalde also argues that the ALJ erred by failing to incorporate Dr. Briscoe's determination
that he "could not currently work due to continuous PTSD and depression since the time of [his]
April 1, 2002, carjacking" into the RFC posed to the VE.  (MSJ, ECF No. 16 at 23.)  As discussed
above, however, Dr. Briscoe's letter does not express any such determination.  The ALJ therefore
did not err by failing to include it in Mr. Elizalde's RFC.

### C. The ALJ Did Not Err by Failing to Consider Dr. Amado's Evaluation

Mr. Elizalde argues that the ALJ erred at Step Three by failing to consider a 2007 mental
residual functional capacity evaluation by Social Security consulting physician Dr. Amado, even
though that evaluation was never provided to the ALJ.  (MSJ, ECF No. 16 at 12-13, 20-21.)  It is not
in the administrative record; Mr. Elizalde submitted the evaluation with his motion for summary
judgment.  (*See* Exhibit B, Ragnes Decl., ECF No. 17 at 5.)

First, this court does not find that Dr. Amado's evaluation warrants a remand.  In reviewing
social security appeals, the court may not consider evidence outside of the administrative record, or
acquire evidence and make factual determinations.  "The role of the courts is wholly appellate."
*Ellis v. Bowen*, 820 F.2d 682, 684 (5th Cir. 1987).  Upon receipt of new evidence, the court may

1    only remand a case to the Commissioner for further action by the Commissioner.  42 U.S.C.A. §

2    405(g).  "Under 42 U.S.C. § 405(g) (Supp. 2001), in determining whether to remand a case in light

3    of new evidence, the court examines *both* whether the new evidence is material to a disability

4    determination *and* whether a claimant has shown good cause for having failed to present the new

5    evidence to the ALJ earlier."  *Mayes*, 276 F.3d at 461-62 (emphasis added).

6        "To be material under section 405(g), the new evidence must bear 'directly and substantially on

7    the matter in dispute.'"  *Id.* at 462 (quoting *Ward v. Schweiker*, 686 F.2d 762, 764 (9th Cir. 1982)).

8    Mr. Penn "must additionally demonstrate that there is a 'reasonable possibility' that the new

9    evidence would have changed the outcome of the administrative hearing."  *Id.* (quoting *Booz v.*

10   *Secretary of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1983)).  As for good cause, a

11   claimant does not establish it "by merely obtaining a more favorable report once his or her claim has

12   been denied."  *Id.* at 463.  "To demonstrate good cause, the claimant must demonstrate that the new

13   evidence was unavailable earlier."  *Id.* (citing *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (

14   "If new information surfaces after the Secretary's final decision and the claimant could not have

15   obtained that evidence at the time of the administrative proceeding, the good cause requirement is

16   satisfied")).  "The claimant must also establish good cause for not having sought the expert's

17   opinion earlier."  *Id.* (citing *Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990)).

18       Mr. Elizalde has not shown good cause for having failed to present the new evidence to the ALJ

19   earlier.  Dr. Amado's evaluation, which related to Mr. Elizalde's 2007 Supplemental Security

20   Income application and was given to and considered by the ALJ considering that application, was

21   available before ALJ Benmour heard Mr. Elizalde's case in 2012.  Mr. Elizalde does not put forth

22   any reason why he could not have provided Dr. Amado's evaluation to ALJ Benmour.

23       Second, even if ALJ Benmour had seen it, Dr. Amado's evaluation does not support Mr.

24   Elizalde's proposed finding that his impairments met or equaled either relevant listing.  In the

25   psychiatric review, under the heading of "B Criteria of the Listings," Dr. Amado found that Mr.

26   Elizalde had only one marked limitation, difficulty maintaining concentration, persistence, or pace.

27   (*See* Exhibit B, Ragnes Decl., ECF No. 17 at 16.)  Dr. Amado further found that the evidence did not

28   establish the presence of the paragraph C criteria.  (*See* Exhibit B, Ragnes Decl., ECF No. 17 at 17.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    This report therefore does not establish that Mr. Elizalde's impairments met or equaled either

2    relevant listing.  There was thus no error because Dr. Amado's evaluation was not available to the

3    ALJ and even if it had been, it would not have supported a finding at Step Three that Mr. Elizalde's

4    impairments met or equaled listings 12.04 or 12.06.

5        Finally, Mr. Elizalde argues that the ALJ erred by failing to incorporate Dr. Amado's evaluation

6    into the RFC posed to the VE.  (MSJ, ECF No. 16 at 23.)  As discussed above, however, Dr.

7    Amado's evaluation was not available to the ALJ, who thus did not err by failing to include it in the

8    RFC.

9    **D. The Medical Evidence Available to the ALJ Does Not Support a Finding That Mr.**

10   **Elizalde's Impairments Met or Equaled a Listing**

11       Mr. Elizalde argues that "the medical evidence" proves his PTSD and anxiety disorders as they

12   currently exist began in 2002, but he provides no citations to the administrative record to support

13   this assertion.  (MSJ, ECF No. 16 at 19-20.)  Mr. Elizalde presented evidence of his *current*

14   impairments, but failed to satisfy his burden of proof for his impairments from 2002-2004. The ALJ

15   thus found only that "*through the date last insured*, the claimant did not have an impairment or

16   combination of impairments that met or medically equaled the severity of one of the listed

17   impairments."  (AR 33-34 (emphasis added).)  The ALJ found the impairments did not meet or

18   medically equal the listings through the date last insured because Mr. Elizalde did not provide

19   sufficient evidence about his symptoms and impairments from 2002-2004.  (AR 34.)

20       Nearly all of the evidence Mr. Elizalde presented demonstrates his impairments from 2007 on,

21   not his impairments from 2002-2004.  (*See generally* AR.)  The only contemporaneous medical

22   evidence offered by Mr. Elizalde is the medical record from his June 2003 psychiatric hold.

23   (AR 332-50.)  This is not sufficient to satisfy either the paragraph A and B criteria or the paragraph

24   C criteria as required by the Code of Federal Regulations. *See* 20 C.F.R. § 404, Subpt. P, App. 1,

25   §§ 12.00, 12.04(B), 12.04(B), 12.06(C), 12.06(C).  While the June 2003 psychiatric hold could be

26   considered an episode of decompensation, it does not comply with the durational requirement of the

27   listing.  To be considered an episode of decompensation of extended duration, the decompensation

28   must last for two weeks, and must occur three times in one year, or an average of once every four

1   months.  *See* 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00.  Mr. Elizalde's psychiatric hold lasted

2   72 hours or less, a duration that is insufficient under the listing.  (*See* AR 332-50.)

3        The only other contemporaneous evidence offered by Mr. Elizalde is a police report and crime

4   victim claim paperwork.  (AR 151-64.)  This evidence is not medical evidence, and although it

5   substantiates the existence of the 2002 carjacking, it does not substantiate any impairments,

6   limitations, mental health, or medical difficulties prior to December 31, 2004.  *See id.*  Evidence of

7   impairments that met or medically equaled listings 12.04 and 12.06 prior to December 31, 2004 is

8   simply not in the record.  Due to the dearth of evidence regarding Mr. Elizalde's symptoms and

9   impairments during the relevant time frame, the court concludes that the ALJ properly found that

10  they did not meet or equal listings 12.04 or 12.06.

11  **E. The ALJ Committed Harmless Error by Failing to Ask the VE If His Testimony Was**

12  **Consistent With the DOT**

13       Mr. Elizalde asserts that "the ALJ erred by failing to ask the VE if his testimony was consistent

14  with the Dictionary of Occupational Titles."  (MSJ, ECF No. 16 at 26; *See* AR 71-74.)  An ALJ may

15  not rely on a VE's testimony without first inquiring whether that testimony conflicts with the

16  Dictionary of Occupational titles.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Such

17  error, however, is harmless where no conflict exists.  *See Massachi*, 486 F.3d at 1154 n.19; *Wells v.*

18  *Colvin*, No. 12-CV-05287-JST, 2013 WL 6225180, at *3 (N.D. Cal. Nov. 23, 2013).

19       The only potential conflict identified by Mr. Elizalde is based on the ALJ's hypothetical, which

20  involved an individual limited to "simple, repetitive tasks."  (MSJ, ECF No. 16 at 24-26; AR 73.)

21  The VE responded by discussing two jobs: kitchen helper and hand packager.  (AR 73.)  Mr.

22  Elizalde asserts that these jobs "have a "Reasoning Level" of two" and therefore "require common

23  sense to carry out detailed but uninvolved instructions."  (MSJ, ECF No. 16 at 25.)  He asserts that

24  this is "logically inconsistent" with a limitation to "simple, repetitive tasks."  (MSJ, ECF No. 16 at

25  25.)  The court disagrees.

26       Uninvolved instructions are perfectly consonant with simple and repetitive tasks.  While detailed

27  instructions could potentially be either simple or complex, this does not create any inherent

28  contradiction, and the qualification that they must be uninvolved significantly limits the potential

UNITED STATES DISTRICT COURT
For the Northern District of California

complexity of these instructions.  There is thus no conflict between an individual limited to "simple, repetitive tasks" and one who can "carry out detailed but uninvolved instructions."  (MSJ, ECF No. 16 at 24-26.)  This conclusion is consistent with the conclusions of many other courts throughout the Ninth Circuit.  *See Creggett v. Colvin*, No. C-13-05642-DMR, 2015 WL 1254621, at *10 (N.D. Cal. Mar. 18, 2015) (finding that "a limitation to simple tasks is consistent with GED Reasoning Development Level 2"); *O'Connor v. Astrue*, No. C-09-01508 JCS, 2010 WL 3785433, at *11 (N.D. Cal. Sept. 27, 2010) (concluding that "level two positions in the DOT are consistent with an RFC for simple, repetitive labor") (internal quotation mark omitted); *Vasquez v. Astrue*, No. CV 08–5305–OP, 2009 WL 3672519, at *3 (C.D.Cal. Oct.30, 2009) (determining that "the DOT's reasoning development Level two requirement does not conflict with the ALJ's prescribed limitation that Plaintiff could perform only simple, routine work"); *Meissl v. Barnhart*, 403 F.Supp.2d 981, 984–85 (C.D.Cal.2005) (finding level two reasoning consistent with an RFC for "simple, routine, repetitive, concrete, tangible tasks").

Given that no conflict existed here, the ALJ's error in failing to ask about any conflict was harmless and thus does constitute a basis for remand.  *See Walker v. Colvin*, No. C 13-4734 PJH, 2015 WL 430766 (N.D. Cal. Feb. 2, 2015); *Behashti v. Astrue*, No. C-09-1676 JCS, 2010 WL 2035355, (N.D. Cal. May 19, 2010).

**F. The ALJ Erred by Failing to Provide Specific, Clear, and Convincing Reasons for Rejecting Mr. Elizalde's Own Testimony, But the Credit-As-True Rule Does Not Apply**

Mr. Elizalde asserts that the ALJ erred by "failing to provide clear and convincing reasons why Mr. Elizalde's testimony was not credible."  (MSJ, ECF No. 16 at 10.)  Where a claimant has (1) presented the requisite objective medical evidence and there is (2) no evidence of malingering, an ALJ may only reject a claimant's subjective testimony about symptoms with (3) specific, clear, and convincing reasons.  *See Chaudry v. Astrue*, 688 F.3d 661, 670-71 (9th Cir. 2012).  An ALJ must identify the testimony that is not credible as well as the evidence that undermines the complaints.  *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  Here, the ALJ erred by failing to provide specific, clear, and convincing reasons for rejecting of Mr. Elizalde's testimony.

The ALJ found that Mr. Elizalde's "medically determinable impairments could reasonably be

1    expected to cause the alleged symptoms," but found that his "statements concerning . . .

2    the limiting effects of these symptoms" were not credible.  (AR 36.)  With the first prong satisfied

3    and because there was no evidence of malingering, the ALJ should have cited specific, clear, and

4    convincing reasons for rejecting Mr. Elizalde's testimony.  The ALJ erred by, rather than pointing to

5    any specific inconsistencies or contradictions which he believed made Mr. Elizalde less credible,

6    only referencing "the above residual functional capacity assessment."  (AR 36); *see also Holohan*

7    *v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (explaining that "the ALJ must specifically

8    identify the testimony she or he finds not to be credible and must explain what evidence

9    undermines the testimony"); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (emphasizing

10   that it is "not sufficient for the ALJ to make only general findings; he must state which pain

11   testimony is not credible and what evidence suggests the complaints are not credible").

12        Given that Mr. Elizalde's testimony was improperly discredited, the court must remand either for

13   reconsideration or for the immediate award of benefits.  The Ninth Circuit has "devised a three-part

14   credit-as-true standard," and when each part is satisfied, a court may "remand to an ALJ with

15   instructions to calculate and award benefits."  *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir.

16   2014). For this credit-as-true rule to be applied, it must be true that "(1) the record has been fully

17   developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has

18   failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or

19   medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would

20   be required to find the claimant disabled on remand."  *Id.*

21        Here, as discussed above, the second prong is satisfied, as the ALJ failed to provide legally

22   sufficient reasons for rejecting Mr. Elizalde's testimony.  The third prong is also satisfied.  Mr.

23   Elizalde testified at the hearing before the ALJ that between the carjacking in 2002 and his date last

24   insured in 2004, he spent three days a week not getting out of bed at all.  (AR 69.)  The ALJ

25   thereafter asked the VE "assuming that I find the claimant's testimony credible, and the person [in

26   the hypothetical] would miss work three times a week, would that person be able to do any jobs?"

27   (AR 74.)  The VE responded by explaining that someone missing work that frequently would not

28   "be employable in regular work."  (AR 74.)  Thus, Mr. Elizalde's inappropriately discredited

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    testimony has been addressed by the VE, who testified that someone with such impairments would

2    be unemployable.  The first prong, however, is not satisfied because an issue remains which requires

3    further development of the record.  Mr. Elizalde testified at the hearing before the ALJ that he began

4    using crystal meth in 2002 (following the carjacking) and did so until going to rehab in 2006 (after

5    his last date insured).  (AR 65-66.)  Where there is significant evidence of drug use/dependence

6    during the alleged period of disability, the ALJ must "perform an appropriate analysis of whether

7    plaintiff's addiction is a contributing factor material to disability pursuant to 42 U.S.C. §

8    423(d)(2)(C)." *Brown v. Astrue*, No. CIV S-09-3125 GGH, 2010 WL 4876591, at *5 (E.D. Cal.

9    Nov. 22, 2010).  Under *Bustamante v. Massanari*, an ALJ must go through the five-step disability

10   analysis and then, if the individual is found to be disabled, determine what impact the drug use may

11   have had on their impairments.  262 F.3d 949, 954-55 (9th Cir.2001).

12       In her decision, the ALJ simply found Mr. Elizalde's "amphetamine dependence to be

13   nonsevere," and based this determination on "insufficient evidence in the record to determine [its]

14   severity."  (AR 33.)  The ALJ did not thereafter address what impact Mr. Elizalde's drug use might

15   have had on his impairments.  This was likely because she had concluded that Mr. Elizalde was not

16   disabled, thus negating any need for such an analysis.  Now, however, with Mr. Elizalde's testimony

17   properly credited and the VE's testimony that someone with such impairments would be

18   unemployable, such an analysis has become necessary.  Given the evidence of Mr. Elizalde's drug

19   use and the initial determination under the five-step disability analysis that he was disabled prior to

20   his date last insured, the ALJ on remand must make "a determination of whether Plaintiff's addiction

21   is a contributing factor material to the disability determination." *Hernandez v. Colvin*, No.

22   C-13-02392 DMR, 2014 WL 4644295, at *8 (N.D. Cal. Sept. 16, 2014).[3]

23                                **CONCLUSION**

24       For the foregoing reasons, Mr. Elizalde's motion is granted in part, the Commissioner's motion

25

26       [3]In his motion for summary judgment, Mr. Elizalde also moves for "expenses incurred under
27   the ECF systems" and "fees and costs to plaintiff and/or plaintiff's counsel."  ECF No. 16 at 2.  This
     motion is premature.  The parties shall meet and confer regarding these matters and Mr. Elizalde
28   may file a separate motion for fees and costs if necessary.

1    is denied, and the case is remanded for further proceedings consistent with this order.

2        This disposes of ECF Nos. 16 and 18.

3        **IT IS SO ORDERED.**

4        Dated:  April 28, 2015

5                                                    _____
                                                     LAUREL BEELER
6                                                    United States Magistrate Judge